In the

# United States Court of Appeals
## for the Ninth Circuit

CENTER FOR BIOLOGICAL DIVERSITY,
*Plaintiff-Appellant,*
v.

DAVID BERNHARDT, in his official capacity as Acting Secretary of
the United States Department of the Interior, et al.,
*Defendants-Appellees,*

PACIFIC LEGAL FOUNDATION, et al.,
*Intervenor-Defendants-Appellees.*

On Appeal from the United States District Court for the
District of Alaska

## AMICUS BRIEF OF THE STATES OF GEORGIA, ALABAMA, ARIZONA, ARKANSAS, KANSAS, INDIANA, LOUISIANA, MISSOURI, NEBRASKA, OKLAHOMA, SOUTH CAROLINA, TEXAS, AND UTAH IN SUPPORT OF APPELLEES

Christopher M. Carr
*Attorney General of Georgia*
Andrew A. Pinson
*Solicitor General*
Ross W. Bergethon
*Deputy Solicitor General*

Jameson B. Bilsborrow
  *Assistant Attorney General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 651-9453

# TABLE OF CONTENTS

Table of Authorities ......................**Error! Bookmark not defined.**

Interest of *Amici Curiae* .................................................. 1

Argument ...................................................................... 3

    I.  The CRA protects separation of powers by giving Congress a tool for reining in administrative overreach. ................... 5

        A.  The expanding administrative state has eroded separation of powers......................................... 5

        B.  The CRA reinforces separation of powers by allowing Congress to curb agency encroachment on legislative power.............................................................. 11

    II.  The CRA is constitutional. ................................. 20

        A.  The CRA complies with the Constitution's bicameralism and presentment requirements...................................... 21

        B.  The CRA poses no "Take Care" or nondelegation problems. .................................................... 22

Conclusion.................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Salazar,*
  672 F.3d 1170 (9th Cir. 2012) .................................................... 23

*Am. Library Ass'n v. F.C.C.,*
  406 F.3d 689 (D.C. Cir. 2005).................................................... 24

*Auer v. Robbins,*
  519 U.S. 452 (1997) ...................................................................... 9

*Bowsher v. Synar,*
  478 U.S. 714 (1986) ................................................................. 5, 6

*Buckley v. Valeo,*
  424 U.S. 1 (1976) ........................................................................... 5

*Chevron, U.S.A., Inc. v. NRDC,*
  467 U.S. 837 (1984) ...................................................................... 9

*I.N.S. v. Chadha,*
  462 U.S. 919 (1983) ....................................................... 10, 22, 23

*Mistretta v. United States,*
  488 U.S. 361 (1989) ...................................................................... 7

*Opp Cotton Mills, Inc. v. Adm'r of the Wage & Hour*
  *Div. of the Dep't of Labor,*
  312 U.S. 126 (1941) ...................................................................... 8

*Perez v. Mortg. Bankers Ass'n,*
  135 S. Ct. 1199 (2015) .................................................................. 5

*Touby v. United States,*
  500 U.S. 160 (1991) ................................................................. 4, 25

*Whitman v. Am. Trucking Ass'ns, Inc.,*
    531 U.S. 457 (2001) ...................................................... 26

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ............................................... 5, 24

**Constitutional Provisions**

U.S. Const. art. I, § 1 .................................................... 23

**Statutes**

5 U.S.C. § 801 .................................................. 12, 13, 14, 25

5 U.S.C. § 802 ........................................................... 13, 14

**Other Authorities**

142 Cong. Rec. S3123 (March 18, 1996) ...................................... 12

142 Cong. Rec. S3683 (April 18, 1996) .................................. 12, 13

81 Fed. Reg. 52,247 (Aug. 5, 2016) ......................................... 16

81 Fed. Reg. 75,494 (Oct. 31, 2016) ........................................ 18

81 Fed. Reg. 86,076 (Nov. 29, 2016) ........................................ 18

81 Fed. Reg. 89,580 (Dec. 12, 2016) ........................................ 19

81 Fed. Reg. 91,702 (Dec. 19, 2016) ........................................ 17

81 Fed. Reg. 91,852 (Dec. 19, 2016) ........................................ 20

81 Fed. Reg. 93,066 (Dec. 20, 2016) ........................................ 17

Administrative Conference of the United States,
    *Sourcebook of United States Executive Agencies,*
    https://www.acus.gov/sites/default/files/documents/S
    ourcebook%202012%20FINAL_May%202013.pdf ...................... 7

American Action Forum, *Regulation Rodeo,*
   https://regrodeo.com/?year%5B0%5D=2016 ............................. 16

Bradford R. Clark, *Separation of Powers as a
   Safeguard of Federalism,* 79 Tex. L. Rev. 1321
   (2001) ............................................................................................ 6

Christopher DeMuth, *The Regulatory State*, National
   Affairs, Summer 2012 ................................................................ 11

Coffey, et al., *The Cumulative Cost of Regulations*
   (Mercatus Working Paper 8, 2016),
   https://www.mercatus.org/publication/cumulative-
   cost-regulations ......................................................................... 10

Curtis W. Copeland, Cong. Research Serv., Report No.
   R40997, *Congressional Review Act: Rules Not
   Submitted to GAO and Congress* (2009), available at
   https://digital.library.unt.edu/ark:/67531/metadc627
   172/ .............................................................................................. 11

*The Federalist No.* 47 (C. Rossiter ed. 1961) (J.
   Madison) ........................................................................................ 8

Gary Lawson, *The Rise and Rise of the Administrative
   State*, 107 Harv. L. Rev. 1231 (1994) ........................................ 8

https://www.federalregister.gov/agencies; ...................................... 7

Jack Goldsmith & John F. Manning, *The Protean Take
   Care Clause*, 164 U. Pa. L. Rev. 1835 (2016) ........................... 24

Joseph Postell, *From Administrative State to
   Constitutional Government* (Kenneth B. Simon
   Center for Principles and Politics, Special Report
   No. 116, 2012), https://www.heritage.org/political-
   process/report/administrative-state-constitutional-
   government ................................................................................ 8, 9

Lawrence Tribe, *American Constitutional Law* (1978)................... 3

Louis Fisher, *The Legislative Veto: Invalidated, It Survives*, 56 Law & Contemp. Probs. 273 (1993) ..................... 21

Nat'l Archives & Rec. Admin., *The United States Government Manual* (2011) and United States General Services Administration, *Federal Executive Branch*, http://www.usa.gov/Agencies/Federal/Executive.sht ml)........................................................................................ 7

Note, *The Mysteries of the Congressional Review Act*, Harv. L. Rev. 2162 (2009) ...................................................14, 15

Paul J. Larkin, Jr., *Reawakening the Congressional Review Act*, 41 Harv. J.L. & Pub. Pol'y 187 (2018).............11, 15

Philip Hamburger, *Is Administrative Law Unlawful?* (University of Chicago Press, 2014)........................................... 3

Schoolhouse Rock: Three-Ring Government (ABC television broadcast March 3, 1979), https://abc.go.com/shows/schoolhouse-rock/episode-guide/season-02/1-threering-government ................................. 5

Sofie E. Miller & Daniel R. Perez, *Measuring the Obama Administration's Historic Midnight Surge* (2017), available at https://www.theregreview.org/2017/02/06/miller-perez-measuring-obama-administration-historic-midnight-surge/ ........................................................................ 16

Susan Parnas Frederick, *Federalism: Agencies and Legislation Encroaching on States' Rights*, ANN.2008 AAJ-CLE 903 (July 2008) ........................................ 1

Tim Devaney, *Study: Obama Administration Issued $40B in "Midnight Regs,"* THE HILL (Jan. 23, 2017)................. 16

Wayne Crews, Jr., *Ten Thousand Commandments: An Annual Snapshot of the Federal Regulatory State* (2017), https://cei.org/sites/default/files/Ten%20Thousand%2 0Commandments%202017.pdf ................................................. 10

The White House, *Press Briefing on the Congressional Review Act* (April 5, 2017), https://www.whitehouse.gov/briefings-statements/press-briefing-congressional-review-act-2-040517/ ..................................................................... 1

# INTEREST OF *AMICI CURIAE*

*Amici curiae* are the States of Georgia, Alabama, Arizona, Arkansas, Kansas, Indiana, Louisiana, Missouri, Nebraska, Oklahoma, South Carolina, Texas, and Utah. *Amici* States have a substantial interest in ensuring that federal administrative rulemaking reflects the will of elected legislators, rather than unelected administrators. Congressional oversight through tools like the Congressional Review Act is an important check on agency actions that unlawfully reach into areas of traditional state authority and impose significant burdens on the States. *See* Susan Parnas Frederick, *Federalism: Agencies and Legislation Encroaching on States' Rights*, ANN.2008 AAJ-CLE 903 (July 2008).

*Amici* States also have a strong interest in ensuring the validity of the CRA and congressional resolutions passed using its procedures. The CRA allows States to work with Congress to stop unlawful regulation. It also shifts governmental power from unelected agencies to Congress, the States, and, ultimately, the people. Congress has used the CRA numerous times in recent years to eliminate unlawful and burdensome rules, many of which had imposed harms on the States. *See* The White House, *Press Briefing on the Congressional Review Act* (April 5, 2017),

https://www.whitehouse.gov/briefings-statements/press-briefing-congressional-review-act-2-040517/ (last visited Mar. 21, 2019). *Amici* States have an interest in making that these harmful regulations are not put back in effect, and that Congress may continue to use the CRA to pare back agency overreach.

# ARGUMENT

The Madisonian clockwork[1] of separation of powers has helped our republic endure for more than 200 years. But a troubling trend over the past several decades has eroded that liberty-preserving system of checks and balances. Broad delegation of legislative power to the executive has enabled the rise of a vast administrative state that now produces far more binding federal law than Congress itself. Among other problems, this "fourth branch" subverts separation of powers by producing burdensome regulation without electoral accountability and undermines federalism by intruding on the lawmaking prerogatives of state and local governments. And the practical consequence is that federal regulations now permeate nearly every aspect of modern life at a staggering cost to the economy.

Momentum has begun to shift against continued growth of the administrative state as skepticism about its conceptual underpinnings has grown. *See generally* Philip Hamburger, *Is Administrative Law Unlawful?* (University of Chicago Press, 2014). For its part, Congress has prioritized trimming back excessive regulation. And one of its most effective tools in this

---

[1] *See* Lawrence Tribe, *American Constitutional Law* 15 (1978).

effort is expedited review of new regulations under the Congressional Review Act.

In a nutshell, the CRA gives Congress an efficient way to review each new agency regulation and, if necessary, pass a law that nullifies it. This straightforward process preserves separation of powers by letting Congress claw back its exclusive legislative power when an agency regulates beyond its statutory mandate. And it promotes federalism by both protecting the States and their citizens from unlawful and overly burdensome federal regulations and leaving more substantive lawmaking to the States. Congress has recently used the CRA to invalidate numerous burdensome regulations, and it has proven particularly useful for combatting so-called "midnight rules" passed by an outgoing administration after an election of a President of the opposite party.

Because the CRA advances separation of powers, the separation-of-powers arguments made against it in this case make little sense. Separation-of-powers violations occur when Congress "delegate[s] its legislative power to another branch of Government," not where, as here, Congress *exercises* its legislative power. *Touby v. United States*, 500 U.S. 160, 165 (1991). This Court should affirm the judgment below.

## I. The CRA protects separation of powers by giving Congress a tool for reining in administrative overreach.

### A. The expanding administrative state has eroded separation of powers.

Separation of powers is a cornerstone of our system of governance, with a "declared purpose of … diffus[ing] power … to secure liberty." *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)). The concept is simple: The legislative branch makes the law, the executive branch enforces it, and the judicial branch interprets it. And a system of checks and balances reinforces this separation of powers. The President can veto laws he finds unwise, Congress can override that veto with a supermajority and also block executive appointments, and the judiciary can prevent enforcement of the illegal acts of the other two branches. This division of power and corresponding system of checks and balances is "a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other" and the threat to individual liberty such a consolidation of power would pose. *Buckley v. Valeo*, 424 U.S. 1, 122 (1976); *see also Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1215 (2015) (Alito, J., concurring in judgment); *e.g.*, Schoolhouse Rock: Three-

Ring Government (ABC television broadcast March 3, 1979), https://abc.go.com/shows/schoolhouse-rock/episode-guide/season-02/1-threering-government (last visited Mar. 18, 2019) (explaining, in a decidedly less popular predecessor to "I'm Just a Bill," the federal government's system of checks and balances).

Separation of powers also advances federalism. Federal lawmaking procedures are inefficient and burdensome by design. *See, e.g.*, *Bowsher*, 478 U.S. at 722 ("That this system of division and separation of powers produces conflicts, confusion, and discordance at times is inherent, but it was deliberately so structured to assure full, vigorous, and open debate on the great issues affecting the people and to provide avenues for the operation of checks on the exercise of governmental power."); Bradford R. Clark, *Separation of Powers as a Safeguard of Federalism,* 79 Tex. L. Rev. 1321, 1324–25 (2001). Each year, these procedures screen out most attempts to exercise federal lawmaking authority: thousands of bills are introduced in Congress, but only a small number are ultimately approved by both houses and signed by the President. All else equal, this built-in inefficiency means more of the work of lawmaking is left to the States. *Id.* at 1340.

The modern administrative state poses a unique threat to separation of powers and its worthy ends. Starting in 1887 with the Interstate Commerce Commission, the nation's first regulatory agency, and accelerating during the New Deal and Great Society, Congress has cooked up an alphabet soup of new executive agencies and sub-agencies, from the Administrative Conference of the United States to the Women's Progress Commemoration Commission—so many, in fact, that there is no authoritative total count. *See* https://www.federalregister.gov/agencies; Administrative Conference of the United States, *Sourcebook of United States Executive Agencies,* https://www.acus.gov/sites/default/files/documents/Sourcebook%20 2012%20FINAL_May%202013.pdf.[2] Some have tried to justify these agencies as serving necessary functions that Congress is ill-equipped to perform on its own. *See, e.g.*, *Mistretta v. United States*, 488 U.S. 361, 372 (1989). ("[O]ur increasingly complex

_____

[2] In 2012, for instance, the *United States Government Manual* listed 96 independent executive units and 220 components of executive departments, while USA.gov listed 137 and 268 such entities, respectively. *Id.* at 15 (citing Nat'l Archives & Rec. Admin., *The United States Government Manual* (2011) and United States General Services Administration, *Federal Executive Branch*, http://www.usa.gov/Agencies/Federal/Executive.shtml).

society, replete with ever changing and more technical problems," means that "Congress simply cannot do its job absent an ability to delegate power under broad general directives."); *Opp Cotton Mills, Inc. v. Adm'r of the Wage & Hour Div. of the Dep't of Labor*, 312 U.S. 126, 145 (1941) ("Congress obviously could not perform its functions if it were obliged to find all the facts subsidiary to the basic conclusions which support the defined legislative policy in fixing, for example, a tariff rate, a railroad rate or the rate of wages to be applied in particular industries by a minimum wage law.").

Whatever the validity of that or other proffered justifications of administrative agencies, the modern administrative state has metastasized to an extent that it threatens to fundamentally undermine separation of powers. Madison warned that "the accumulation of all powers legislative, executive, and judiciary in the same hands … may justly be pronounced the very definition of tyranny." *The Federalist No.* 47, p. 301(C. Rossiter ed. 1961) (J. Madison). Yet modern administrative agencies regularly handle all three roles. *See* Gary Lawson, *The Rise and Rise of the Administrative State*, 107 Harv. L. Rev. 1231, 1248 (1994); *see also* Joseph Postell, *From Administrative State to Constitutional Government* 2 (Kenneth B. Simon Center for Principles and

Politics, Special Report No. 116, 2012),
https://www.heritage.org/political-process/report/administrative-
state-constitutional-government ("Power is transferred from
Congress to agencies and departments, which are then influenced
by all three branches of government but not directly accountable
to any, and the effect of checks and balances is reversed."). Many
agencies can promulgate substantive, binding rules of conduct;
investigate violations of those rules; prosecute and adjudicate
complaints; and hear appeals of their own findings. Lawson,
*supra*, at 1248 (providing example of Federal Trade Commission
enforcement activities).[3] And even if an Article III court ultimately
reviews the agency's decision, that decision is typically afforded a
strong presumption of correctness. *Id.*; *see also Chevron, U.S.A.,
Inc. v. NRDC*, 467 U.S. 837, 844 (1984) (holding that "considerable
weight should be accorded to an executive
department's construction of a statutory scheme it is entrusted to
administer"); *Auer v. Robbins*, 519 U.S. 452, 461–62 (1997)
(requiring deference to an agency's interpretation of its own

---

[3] *See also* Postell, *supra,* at 2–3 (describing National Labor
Relations Board's actions as "lawmaker, investigator, prosecutor,
judge, jury, and executioner" in blocking Boeing from moving
some of its facilities to South Carolina, a "right to work" state).

ambiguous regulations, even if the interpretation is advanced for the first time in a legal brief).

Further, administrative agencies face the same "hydraulic pressure" to exceed the limits of their authority, *see I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983), but they lack the political accountability of elected officials. The unsurprising result is overregulation. Indeed, at least in terms of sheer numbers, administrative agencies—and not Congress—are now the primary source of federal law. *See* Wayne Crews, Jr., *Ten Thousand Commandments: An Annual Snapshot of the Federal Regulatory State* 56 (2017), https://cei.org/sites/default/files/Ten%20Thousand%20Commandm ents%202017.pdf (noting that during calendar year 2016, Congress enacted 214 laws, whereas agencies enacted 3,853 rules—a ratio of 18 rules for every law).

These regulations reach virtually every aspect of modern life, and at staggering cost. One study estimates that regulations passed since 1980 have lowered the country's GDP by $4 trillion. Coffey, et al., *The Cumulative Cost of Regulations,* (Mercatus Working Paper 8, 2016), https://www.mercatus.org/publication/cumulative-cost-regulations (last visited Mar. 21, 2019). Another places the costs of complying

with federal regulations for 2015 alone at $1.963 trillion, a figure larger than the entire gross domestic products of all but six countries that year. Crews, *supra,* at 2–3. And this administrative overreach does not appear to be a partisan problem. *See* Paul J. Larkin, Jr., *Reawakening the Congressional Review Act*, 41 Harv. J.L. & Pub. Pol'y 187, 189 n.2 (2018) (citing Christopher DeMuth, *The Regulatory State*, National Affairs, Summer 2012, 70 (noting that during the half-century before President Obama's election, the greatest growth in regulation came under Presidents Richard Nixon and George W. Bush).

This situation has compounded to the point of causing great harm to the States and their citizens. Fortunately, Congress has responded by using various tools at its disposal to trim back administrative excesses. One such tool is expedited review of new regulations through the Congressional Review Act.

## B. The CRA reinforces separation of powers by allowing Congress to curb agency encroachment on legislative power.

Enacted in 1996, the CRA gives Congress a modest yet effective measure it can use to push back against agency overreach and its corresponding threat to separation of powers. 5 U.S.C. §§ 801–808 (1996); Curtis W. Copeland, Cong. Research

Serv., Report No. R40997, *Congressional Review Act: Rules Not Submitted to GAO and Congress* 21 (2009), available at https://digital.library.unt.edu/ark:/67531/metadc627172/ (noting that "the CRA was enacted in an attempt to reclaim a measure of congressional control"). Three of its sponsors wrote in a joint statement that the CRA was meant to "redress the balance [between the branches], reclaiming for Congress some of its policymaking authority, without at the same time requiring Congress to become a super regulatory agency." 142 Cong. Rec. S3683 (April 18, 1996) (statement of Sens. Nickles, Reid, and Stevens). Another wrote that "[i]f a rule goes too far afield from the intent of Congress in passing the statute in the first place, we can stop it. That's a new day, and one a long time in coming." *Id*. at S3123 (March 18, 1996) (statement of Sen. Levin).

The CRA sets up an expedited procedure that enables Congress to set aside new agency rules before they can go into effect. The CRA review process, in relevant part, is as follows: Agencies are required to submit any new rules to Congress for review, along with a "concise general statement relating to the rule" and the rule's proposed effective date. 5 U.S.C. § 801(a)(1)(A)(ii). Once each house receives a rule from an agency for review, each house must submit the rule to its standing

committee with jurisdiction over the law under which the rule was issued. *Id.* § 801(a)(1)(C). After an agency submits a rule to Congress, the houses have 60 days to decide whether to disapprove the rule. *See id.* § 802(a). If the houses choose to disapprove the rule, they will do so via a joint resolution. *See id.* To expedite this process in the Senate, in particular, the CRA includes detailed provisions for how consideration of a CRA resolution is to take place in that house. *See id.* § 802(b)–(e). Once one house passes a joint resolution, the resolution is then voted upon in the other house without referral to committee. *Id.* § 802(f). A joint resolution that has been passed by both Houses is then presented to the President. *See id.* § 801(a)(3)(B); 142 Cong. Rec. S3683 (April 18, 1996). If, as relevant here, the President signs this resolution into law, the rule at issue is nullified and the agency is prohibited from adopting a "substantially" similar rule in the future, unless Congress "specifically authorize[s]" such a rule by law. 5 U.S.C. § 801(b), (f).

Several features of the CRA make it more efficient than standard House and Senate procedures. *First*, CRA disapproval resolutions can bypass the congressional committee process. If a Senate committee has not reported out a disapproval resolution within twenty days of a major rule being submitted to Congress,

the resolution can be brought to the Senate floor upon a petition signed by thirty senators. Note, *The Mysteries of the Congressional Review Act,* 122 Harv. L. Rev. 2162, 2168 (2009) (citing 5 U.S.C. §802(c)). For unknown reasons, the House of Representatives did not enact similar procedures, but House committees may still be skipped in some circumstances: when a disapproval resolution is sent from the Senate to the House, or vice versa, the receiving chamber cannot refer the resolution to a committee. *Id.* (citing 5 U.S.C. §802(f)(1)). *Second*, the CRA prohibits Senate filibusters of disapproval resolutions by setting time limits for debate and eliminating other procedural hurdles. *Id.* (citing 5 U.S.C. §802(d)). *Third*, the CRA creates a special extended review period for major rules that are submitted to Congress in the final sixty days of a congressional session. *Id.* (citing 5 U.S.C. § 801(d)(1)). These rules can be disapproved within seventy-five legislative days of when the next session of Congress convenes. As a practical matter, this gives time to the succeeding President and Congress to review the prior administration's last-minute rules. *Id. Fourth*, disapproval resolutions can only be enacted as stand-alone measures, using a template provided in the statute. *Id.* (citing 5 U.S.C. § 802(a)). The template ensures that the resolutions will be

identical in both houses, thus doing away with the need for conference reports. *Id.*

At bottom, the CRA gives Congress an efficient mechanism to counter overreaching rules by quickly blocking regulations without requiring impacted parties—including the States—to engage in costly and time-consuming litigation. Without the CRA's mechanisms, it could take Congress or the courts far longer stop illegal and harmful rules. The CRA also lets the States work with the people's elected representatives in Congress to halt unlawful regulation and to shift governmental power back to elected officials—at the federal or state level—and away from unelected agencies.

The CRA has proven especially useful for curbing so-called "midnight rules." These are rules issued by an outgoing administration prior to the inauguration of a President from the opposite party. Larkin, *supra,* at 190 n.6. Midnight rules are an especially problematic form of agency overreach: they can be issued without any political accountability for the outgoing administration; they leave the new administration with the extra burden of enforcing rules it may not even agree are necessary or even lawful; and they can short circuit the amount of time afforded for agency review of comments. *Id.* During the last two

months of the Obama administration, for instance, federal agencies issued 41 major rules with an estimated economic impact of more than $40 billion.[4] *See* Sofie E. Miller & Daniel R. Perez, *Measuring the Obama Administration's Historic Midnight Surge* (2017), available at https://www.theregreview.org/2017/02/06/miller-perez-measuring-obama-administration-historic-midnight-surge/.

Congress has used the CRA to nullify a number of midnight rules that harmed the states. Examples include:

1. <u>The Alaska National Wildlife Refuges Rule</u>. The rule at issue in this case, 81 Fed. Reg. 52,247 (Aug. 5, 2016), displaced Alaska's traditional authority to regulate hunting within its borders. Alaska was forced to bring a lawsuit to try to block this

---

[4] Among the most expensive midnight rules were the Energy Department's efficiency standards for central air conditioners ($12.3 billion) and ceiling fans ($4.4 billion). Others include the Environmental Protection Agency's Renewable Fuel Standard ($1.5 billion), as well as the Interior Department's natural gas standards on public lands ($2.4 billion) and stream protection rule ($1.2 billion). *See* Tim Devaney, *Study: Obama Administration Issued $40B in "Midnight Regs,"* THE HILL (Jan. 23, 2017), https://thehill.com/regulation/315667-study-obama-administration-issued-40b-in-midnight-regs (citing American Action Forum, *Regulation Rodeo,* https://regrodeo.com/?year%5B0%5D=2016, (listing 2016 regulations and estimated costs)).

rule. *See* Compl., *Alaska v. Zinke*, No. 17-cv-00013 (D. Alaska Jan. 31, 2017), ECF No. 1. Congress's adoption of a CRA resolution, Pub. L. 115-20, protected Alaska's sovereign rights and allowed it to dismiss its challenge to the rule, *see* Am. Compl., *Alaska v. Zinke*, No. 17-cv-00013 (D. Alaska June 13, 2017), ECF No. 60 (removing challenge to Department of the Interior's Refuges Rule).

2. <u>The Department of the Interior's Stream Protection Rule</u>. This rule imposed onerous requirements on coal mines located near streams. 81 Fed. Reg. 93,066 (Dec. 20, 2016). This rule was unlawful in multiple respects and triggered a lawsuit by 13 States. *See* Compl., *Ohio v. U.S. Dep't of Interior*, No. 17-cv-00108 (D.D.C. Jan. 17, 2017), ECF No. 1. Congress eliminated this rule using the CRA, Pub. L. 115-5, allowing dismissal of the lawsuit, *see* Notice of Voluntary Dismissal, *Ohio v. U.S. Dep't of Interior*, No. 17-cv-00108 (D.D.C. May 1, 2017), ECF No. 28.

3. <u>The Social Security Administration's rule banning gun possession by certain recipients</u>. This rule prohibited law-abiding Americans from possessing firearms when the Social Security Administration determined that they needed help managing their finances. 81 Fed. Reg. 91,702 (Dec. 19, 2016). As 13 States explained in a letter to congressional leaders, the rule violated both Second Amendment rights and basic notions of due process.

Congress heeded the States' warnings and acted promptly to eliminate this rule under the CRA. *See* Pub. L. 115-8.

4. <u>The Department of Education's rule relating to accountability and state plans</u>. This rule placed burdensome school testing, reporting, and planning requirements on States that received certain federal funds. 81 Fed. Reg. 86,076 (Nov. 29, 2016). States on both sides of the political aisle submitted comments protesting the rule for unlawfully expanding federal reach into the States' education policies. *See, e.g.*, Comments of Wisconsin Department of Public Instruction, ED-2016-OESE-0032-14216 (July 28, 2016); Comments of South Carolina Department of Education, ED-2016-OESE-0032-19858 (Aug. 2, 2016); Comments of Vermont State Board of Education, 1, ED-2016-OESE-0032-19544 (Aug. 2, 2016); Comments of Colorado Department of Education, ED-2016-OESE-0032-19819 (Aug. 2, 2016). In response, Congress nullified this unlawful, expansive rule under the CRA. *See* Pub. L. 115-13.

5. <u>The Department of Education's rule relating to teacher-preparation issues</u>. This rule mandated that to receive certain federal funds, States would have to alter their systems for identifying, reporting, and addressing the performance of their teacher-preparation programs for postsecondary education. 81

Fed. Reg. 75,494 (Oct. 31, 2016). This rule drew sharp criticism from States across the political spectrum. *See, e.g.*, Comments of the Board of Regents for the University of Georgia, 3, ED-2014-OPE-0057-4890 (May 1, 2016); Comments of California Commission on Teacher Credentialing, 1, ED-2014-OPE-0057-2613 (Feb. 2, 2015).

6. The Bureau of Land Management's rule relating to the development of land-use plans. This rule limited state and local government input into the Bureau of Land Management's development process by replacing state and local directors with "deciding officials" and by allowing BLM to disregard state and local government programs if they did not conform to BLM's idea of an "officially approved or adopted plan." 81 Fed. Reg. 89,580, 89,591, 89,614–89,615 (Dec. 12, 2016). Multiple states submitted comments expressing concerns that the rule diminished valuable state and local input into land management programs "in favor of 'social change.'" *See, e.g.* Comment of the Wyoming Governor, 1, BLM-2016-0002-0298 (May 25, 2016); Comment of Alaska, BLM-2016-0002-0233 (May 25, 2016); Comment of New Mexico, 3, BLM-2106-0002-0354 (June 7, 2016). Congress addressed these concerns and eliminated the rule through the use of the CRA. *See* Pub. L. 115-12.

7. <u>The Department of Health and Human Services' rule relating to the selection of "subrecipients" of Title X funding</u>. This rule limited States' ability to control the redistribution of Title X funding according to their own priorities. 81 Fed. Reg. 91,852, 91,860 (Dec. 19, 2016). Although the comment period for this rule was unusually short, seven states submitted a letter explaining that the rule was too costly and raised significant federalism concerns by forcing states to fund abortion providers. Comments of Arkansas, Arizona, South Carolina, Louisiana, Oklahoma, Texas, and Nebraska, 2–6, HHS-OS-2016-0014-14249 (Oct. 7, 2016). Congress promptly addressed these concerns by eliminating this rule under the CRA. *See* Pub. L. 115-23.

## II. The CRA is constitutional.

The district court was right to dismiss Plaintiff's constitutional challenges to the CRA, which reinforces rather than violates principles of separation of powers. *First*, unlike the legislative veto, CRA disapproval resolutions satisfy the Article I requirements of bicameralism and presentment: the resolutions are passed by both house of Congress and presented to the President for approval. *Second*, the CRA does not violate the Take Care Clause of Article I. Congress is not required to amend the underlying statute when nullifying a regulation under the CRA.

But even if CRA resolutions somehow frustrated agencies in carrying out their statutory directives, as Plaintiff contends, that would not offend the Take Care Clause, which serves as a limit on *executive* power to execute only the laws Congress has enacted. *Third,* the CRA's prohibition against agencies reissuing the nullified rule or a new rule "substantially the same" as the original does not pose a nondelegation problem. Far from improperly *delegating* legislative power, by instructing agencies not to issue specific rules through a resolution, Congress necessarily *withholds* legislative power. The Court should thus affirm the ruling below.

### A. The CRA complies with the Constitution's bicameralism and presentment requirements.

To begin with, the CRA avoids the constitutional flaws that undermined past mechanisms for fast-track congressional review of new agency rules. Recall that from the 1930s to the 1980s, Congress enacted so-called "legislative vetoes"—provisions inserted into statutes that allowed for nullification of executive agency action via a congressional resolution. Louis Fisher, *The Legislative Veto: Invalidated, It Survives*, 56 Law & Contemp. Probs. 273 (1993). The problem, however, was that none of these legislative vetoes complied with the Article I requirements of

bicameralism (passage by a majority of both houses) and presentment to the President; many required votes by only one house or even by a single committee, and none were presented to the President for his signature. For those reasons, the Supreme Court declared such legislative vetoes unenforceable. *Chadha,* 462 U.S. at 956–58; *see id.* at 959 (Powell, J., concurring).

The CRA suffers from neither of the constitutional flaws that led to the demise of the legislative veto in *Chadha.* As the district court recognized, disapproval resolutions under the CRA, including the one at issue in this lawsuit, Public Law 115-20, are passed by both the House and the Senate and submitted to the President for approval. Likewise, the CRA itself was passed by both houses and signed into law by President Clinton. Doc. 129 at 18–19. The CRA nullification process thus poses no bicameralism or presentment problems, *id.*, a point Plaintiff no longer appears to contest.

## B.  The CRA poses no "Take Care" or nondelegation problems.

Nor does the CRA violate the Take Care Clause of Article II, Section 3. *See* Appellant's Br. at 18–27 (theorizing that CRA resolutions, or at least those lacking explicit "language to affirmatively modify the underlying statute," prevent agencies

from faithfully executing those underlying statutes, in violation of the Take Care Clause). Congress does not have to use magic words to amend the underlying statute when nullifying one of its implementing regulations via the CRA. *See All. for the Wild Rockies v. Salazar*, 672 F.3d 1170, 1174 (9th Cir. 2012) (holding that when Congress "directs an agency action" in a manner inconsistent with prior law, "Congress has amended the law"). Plaintiff's contrary theory overlooks the obvious possibility that rule-authorizing statutes can permit a range of permissible rule formulations. The fact that a CRA resolution nullifies one particular rule formulation arguably permitted by the original statutory directive does not impede the agency from adopting a materially different alternative rule, *see* Appellant's Br. at 29–31 and Plaintiff has not shown that Public Law 115-20 was the *only* rule permitted by the underlying statutes.

More fundamentally, even if CRA resolutions somehow frustrated agencies in carrying out their statutory directives, that would not amount to a *separation-of-powers* problem, which occurs when one branch of government "exceed[s] the outer limits of its power." *Chadha*, 462 U.S. at 951. Lawmaking is indisputably an Article I power that belongs to Congress. *See* U.S. Const. art. I, § 1 ("All legislative Powers … shall be vested in … Congress."). That

means that Congress gets to choose what kinds of rules it wants to permit as well as what kinds it wants to prohibit. *See Am. Library Ass'n v. F.C.C.*, 406 F.3d 689, 691 (D.C. Cir. 2005) ("It is axiomatic that administrative agencies may issue regulations only pursuant to authority delegated to them by Congress.").

Plaintiff offers no support for the notion that agency rulemaking authority is a special kind of Article II executive power. Nor could it: "the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co.*, 343 U.S. at 587. To that end, if anything, rather than affirmatively granting power, the Take Care Clause serves as a kind of *limit* on executive authority, "oblig[ing] the President to respect the means and ends of statutory policy power specified by Congress." Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*, 164 U. Pa. L. Rev. 1835, 1849–50 (2016); *see also Youngstown Sheet & Tube Co.*, 343 U.S. at 633 (Douglas, J., concurring) ("[T]he power to execute the laws starts and ends with the laws Congress has enacted."); *id.* at 610 (Frankfurter, J., concurring) ("The duty of the President to see that the laws be executed is a duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power." (citation omitted)). In short, when

Congress delegates authority to an agency to adopt a particular kind of rule but then later changes its mind, it does not take away anything that ever belonged to the Executive. The CRA accordingly does not give Congress "some new power at the expense of the executive branch." Appellant's Br. at 17 n.5.

Finally, the CRA does not pose a nondelegation problem. The CRA's prohibition against agencies reissuing the nullified rule or a new rule "substantially the same" as the original, 5 U.S.C. § 801(b)(2), does not leave the agency without adequate standards to guide the exercise of its delegated statutory authority. *See* Appellant's Br. at 28. Even if the CRA's bar against subsequent rules that are "substantially the same" as the original created some uncertainty as to just how different a new rule must be to pass muster, *see* Larkin, *supra*, at 250 ("How different a rule must be to satisfy that requirement is uncertain."), such uncertainty in no way creates a *separation-of-powers* problem. Again, separation-of-powers violations occur when Congress "delegates its legislative power to another branch of Government." *Touby*, 500 U.S. at 165. That means that to avoid an impermissible delegation of legislative authority when "confer[ring] decisionmaking authority upon agencies, Congress must lay down by legislative act an intelligible principle to which" the agency "is directed to conform."

*Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001) (cleaned up).

Plaintiff's suggestion that Congress violates the nondelegation doctrine—and thus separation of powers—whenever a statute directed toward an agency lacks an intelligible principle, *see* Appellant's Br. at 27, confuses a necessary condition for a sufficient one. For nondelegation violations to occur, it is not alone sufficient that a statute contain some indeterminacy; rather, it must do so in a way that *actually* "delegate[s] legislative power to the agency." *Whitman*, 531 U.S. at 472. But CRA resolutions clearly do the opposite: apart from delegating legislative power, by instructing agencies not to issue specific rules through a resolution, Congress necessarily *withholds* legislative power. Put simply, giving agencies a shorter leash with which to exercise delegated authority does not violate separation of powers on nondelegation grounds.

## CONCLUSION

In all, the CRA is a lawful procedural tool, which, as recent experience has demonstrated, allows Congress to expeditiously eliminate illegal or harmful rules, while working with the States. This Court should affirm the dismissal of Plaintiff's complaint.

Respectfully submitted.

/s/ *Andrew A. Pinson*
Christopher M. Carr
  *Attorney General of Georgia*
Andrew A. Pinson
  *Solicitor General*
Ross W. Bergethon
  *Deputy Solicitor General*
Jameson B. Bilsborrow
  *Assistant Attorney General*

Office of the Georgia
  Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 651-9453
apinson@law.ga.gov

Steve Marshall
  *Attorney General of Alabama*

Leslie Rutledge
  *Attorney General of Arkansas*

Mark Brnovich
  *Attorney General of Arizona*

Derek Schmidt
  *Attorney General of Kansas*

Curtis Hill
  *Attorney General of Indiana*

Jeff Landry
  *Attorney General of Louisiana*

Eric S. Schmitt
  *Attorney General of Missouri*

Doug Peterson
  *Attorney General of Nebraska*

Mike Hunter
  *Attorney General of Oklahoma*

Alan Wilson
  *Attorney General of South Carolina*

Ken Paxton
  *Attorney General of Texas*

Sean Reyes
  *Attorney General of Utah*

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2019, I served this brief by
electronically filing it with this Court's ECF system, which
constitutes service on all attorneys who have appeared in this case
and are registered to use the ECF system.


<u>/s/ *Andrew A. Pinson*</u>
Andrew A. Pinson

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 18-35629

I am the attorney or self-represented party.

**This brief contains** | 5,036 | **words**, excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one):*

    ○ it is a joint brief submitted by separately represented parties;

    ○ a party or parties are filing a single brief in response to multiple briefs; or

    ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [    ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Andrew A. Pinson     **Date** | 3/22/19

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                           *Rev. 12/01/2018*